Rodney A. BRIGHT, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 436, 1998.

Supreme Court of Delaware.

Submitted: May 18, 1999.
Decided: June 15, 1999.
Rehearing Denied July 21, 1999.

Joseph M. Bernstein, Wilmington, Delaware, for Appellant.

Rosemary K. Killian (argued) and Timothy J. Donovan, Jr., Deputy Attorneys General, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

WALSH, Justice:

Defendant below/appellant, Rodney A. Bright ("Bright"), appeals his convictions of Attempted Murder First Degree and four counts of Terroristic Threatening. Bright raises two claims of error. Bright contends that the trial court committed plain error by admitting certain character evidence in violation of Delaware Uniform Rules of Evidence ("D.R.E.") 404, and, relatedly by admitting this evidence notwithstanding an objection based upon D.R.E. 503, the patient-psychotherapist privilege. Bright also challenges the sufficiency of the evidence for the Attempted Murder conviction. We reject both claims and affirm the convictions.

I

Bright and his wife, Ona Bright ("Ona"), were divorced in November, 1986. Ona received custody of their three sons. In 1986, Bright was institutionalized, and upon his release moved to Indianapolis. Between 1986 and June 1994, Ona concealed her family's whereabouts from Bright. In 1989, Ona moved her family to Delaware. In order to attend the high

school graduation of his oldest son, Nathan, Bright was permitted to visit his children at their home in Delaware in June 1994. During his visit Bright told Ona that she "had two defective children and that [she] didn't deserve to live." Bright also told Ona that he would kill her when Eli, their youngest son, turned eighteen.

Bright received medical and psychiatric treatment as an outpatient at the Veteran's Administration hospital in Indianapolis, Indiana beginning in 1990. Bright was treated primarily for bipolar disorder,[1] sometimes called manic depressive disorder.[2] From 1991 to 1994, Dr. Aimee Mayeda[3] ("Dr. Mayeda"), a psychiatrist, was the supervisor of Bright's treatment team.

In late Spring 1994, Bright expressed to members of his treatment team thoughts about killing Ona. These expressions were apparently precipitated by his plan to go to Nathan's graduation. After the trip to Delaware, Bright expressed anger and stated to Dr. Mayeda that he was unhappy with Ona's values and the way that she was raising the children. Bright continued through the summer to express thoughts of killing Ona, and the intensity increased toward the end of the summer to the point of stating that he planned to kill her as soon as his youngest son reached the age of eighteen. Bright stated that he felt no guilt over these thoughts and that he believed it was something that he was allowed to do. Around Thanksgiving, Ona testified that Bright began making frequent telephone calls, "put[ting her] down as a mother," and telling her that she

"didn't deserve to live." During one of the calls, Bright requested permission to visit at Christmas. Ona refused.

On December 3, 1994, Bright was admitted to the hospital complaining of weakness in an arm and a leg. Bright asked for and received permission for an early discharge on December 7. Upon learning of his discharge, Dr. Mayeda called Bright and arranged an appointment for the following day, December 8. Bright contacted Dr. Mayeda on December 8 and told her that there was no need to keep the appointment because he had made up his mind to go back to Delaware and kill Ona.

Bright told Dr. Mayeda that he had spoken with Ona earlier in the week and that "she had pissed him off." Bright also told her that he had a car that was impounded and if he couldn't get it out, he would take a plane. He claimed to have a gun and that he would shoot Ona and if he couldn't do that he would strangle her. Dr. Mayeda persuaded Bright to see her the next day. Dr. Mayeda also secured Ona's telephone number from Bright who stated that giving her the number "didn't matter" because no matter what Dr. Mayeda did, "he would be able to carry out his plan anyway."

Dr. Mayeda then called Ona and told her that Bright had expressed a threat to kill her and would shortly be leaving Indiana. Ona responded that Bright had been making threats for a long period of time and did not express surprise. Dr. Mayeda also called the Delaware State police who connected her to the New Castle County police.

1. Dr. Mayeda, Bright's psychiatrist, testified that bipolar disorder is an illness with which the person has some sustained period of normal mood and function that is interspersed with manic periods and depressed periods. During the period of time when the person is manic, they are agitated, their behavior becomes chaotic, and they experience great difficulty in following through with a single task. During the period when they are depressed, they experience hopelessness, lack of energy, and everything slows down, including speech.

2. Bright was also diagnosed with alcohol abuse, panic disorder, and mixed personality disorder with antisocial and narcissistic features.

3. The Superior Court, in its opinion on Bright's motion to suppress, referred to Dr. Mayeda as Dr. Mayetta relying on the State's submission and after noting a discrepancy in the spelling of her name in the affidavit of probable cause. *State v. Bright*, Del.Super., 683 A.2d 1055, 1058, 1058 n. 3 (1996).

Bright's appointment with Dr. Mayeda had been set for noon on December 9, 1994, and she arranged for security to be available. Bright called Dr. Mayeda and stated that there was no point in keeping the appointment because he was leaving right then to go kill Ona. Dr. Mayeda told him that she had already contacted Ona and the police. Bright replied that "it didn't matter. He was still going to be able to carry it out. He would shoot any police that tried to interfere with him," and claimed to have numerous guns and plenty of ammunition. Bright also told Dr. Mayeda that he had a friend in Philadelphia who was an ex-con.

Thereafter, Dr. Mayeda called Ona again and told her of Bright's plans. Dr. Mayeda also called the New Castle County police again and informed them of Bright's threats. Dr. Mayeda then called the local police in Indianapolis who recommended that she file a request for emergency detention. The New Castle County police also contacted Ona and stayed with her and her family on December 9 and 10. On the night of the 10th, the police insisted that Ona and her family go to different houses to spend the night.

Around midnight on December 10, 1994, Bright was arrested at a motel in Richmond, Indiana, sixty miles due east of Indianapolis. Bright was intoxicated and uncooperative. The police seized a loaded handgun that was laying on the bed, a knife located in a boot by the bed, and some ammunition. Bright was taken to a local hospital for alcohol evaluation and then sent to the county jail. He was subsequently released.

Ona and her family did not stay at their home on December 10, but returned December 11 after learning that Bright had been arrested in Indiana. On the answering machine were "really ugly threatening phone calls" that contained graphic details about what he was going to do.[4] Over the next several days Ona continued to receive threatening phone calls from Bright.

Bright continued on his way East traveling more than seven hundred miles. On December 14, 1994, Bright made a purchase from a drug store in Rosemont, Pennsylvania, approximately twenty miles west of Philadelphia. On that same date Bright registered at the Econo Lodge on Route 13 in New Castle under the name "Randall Bryant," although he signed the register "Rodney A. Bryant." Bright also got a room at the Motel 6 located almost directly across the street from the Econo Lodge. On December 15, 1994 Bright made a purchase at a hardware store located approximately one quarter mile from the Econo Lodge. On that date, Bright also checked out of the Motel 6.

At approximately 6:00 am, on December 16, 1994, a deputy sheriff from the Cecil County, Maryland Sheriff's office responded to 312 Jackson Hall School Road concerning a suspicious vehicle in the back yard of a residence. Jackson Hall School Road is between Ona's residence and her place of work in Elkton, Maryland, just over the Delaware state line. The officer realized that it was the same vehicle that had been involved in a single car accident four hours earlier. Bright was in the vicinity of the vehicle and told the officer that he was on a hunting trip and had gotten separated from his party. Bright gave the officer Ona's phone number. Another officer called Ona and told her that they had Bright who was looking to find her house, he was lost, and would she come get him or give directions. Ona explained the situation to the officer.

Shortly thereafter, Bright was taken into custody based on warrants issued in Delaware. At the scene, Bright blurted out to an officer that "I should have killed my wife when I had the chance." Bright's car was subsequently searched by Delaware police. The search yielded a Kabar brand hunting knife in a map compartment located on the driver's side door, a knife holster, a gun holster bag, numerous bags

4. Some of the phone calls were played for the   jury.

of clothing, assorted travel maps, and a motel key for Room 116 at the Econo Lodge motel.

The Econo Lodge motel room was also subsequently searched. The police recovered an address book, a tan leather holster, several prescription bottles, a new roll of clothesline, a roll of gray duct tape, a sharpening stone, an empty box for a Kabar knife,[5] a Pennsylvania map, a Veteran's Administration ID card, a receipt for the Motel 6, cash register receipts, and some Indiana court documents concerning "State v. Rodney Bright." The phone log from the hotel showed five telephone calls to Ona's number on December 14 and 15. Bright was extradited to Delaware and during booking spontaneously stated that "he had spent twenty-six years with his wife and he was going to get her and no one was going to stop him." He further stated that "he was the judge and jury and not even [the officer] was going to stop him." Subsequent to his arrest, and despite a no contact order, Bright sent many letters to Ona and their sons.

## II

### A

Bright's first contention is that the trial court erred in admitting certain "character" evidence in violation of D.R.E. 404. Bright contends that the character evidence was also inadmissible under the patient-psychotherapist privilege reflected in D.R.E. 503. Bright takes issue with two categories of evidence: testimony of Dr. Mayeda and post-arrest letters written by Bright and sent to Ona and their sons.

Specifically, Bright complains that the testimony of Dr. Mayeda that related to his obsessive thoughts and threats directed against his wife, and the steps that Dr. Mayeda took to counteract Bright's plans, were evidence of a propensity for violence. Bright concedes that his attorney made no

objection at trial to Dr. Mayeda's testimony based upon D.R.E. 404, but did object to "her testifying about things that were said in confidence and things that were said by my client during the client-patient situation."

■ Our review of the record reflects that Bright's counsel's objection was in the nature of a continuing objection to disclosures by Dr. Mayeda notwithstanding that the Superior Court had ruled, pretrial, that such disclosures fell within "a well established exception" to the psychotherapist's duty of confidentiality. *State v. Bright*, Del.Super., 683 A.2d 1055, 1064 (1996). There were no individual objections made during Dr. Mayeda's testimony to the numerous listed statements that Bright now claims as error. Accordingly, we will review only for plain error. Supr. Ct. R. 8; *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100, *cert. denied*, 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986).

■ With certain exceptions, D.R.E. 503 provides an evidentiary privilege against disclosure of confidential communications between a patient and a physician or psychotherapist. In addition to the exceptions listed in D.R.E. 503(d), there is an exception based on the common law duty of a mental health care provider to persons other than the patient. *Naidu v. Laird*, Del.Supr., 539 A.2d 1064, 1072 (1988). Such a duty affirmatively requires the mental health care provider to exercise reasonable care in the treatment and discharge of patients to protect against reasonably foreseeable events, including, if necessary, warning potential victims when the provider knows that the patient's dangerous propensities present an unreasonable risk of harm to others. *Id.* at 1072–73.

■ In its pretrial ruling the Superior Court determined that Bright's communi-

5. The Kabar knife box, and the sharpening stone had stickers on them from the local hardware store.

cations with Dr. Mayeda fell within this common law exception to the privilege and denied Bright's motion to suppress the "threatening statements made to [Dr. Mayeda] and all derivative evidence resulting therefrom." *Bright*, 683 A.2d at 1059, 1065. On appeal, Bright does not challenge this ruling, but argues that Dr. Mayeda's testimony exceeded its limits.

We agree with the Superior Court that the disclosures by Dr. Mayeda fall within this well known exception to the patient-psychotherapist privilege. The testimony that Bright complains of on appeal arose in the context of, and was intertwined with, Dr. Mayeda's duty to warn Ona based upon the immediacy and increasing intensity of Bright's threats and actions.

### B

Having found that D.R.E. 503 did not prevent the admission of Dr. Mayeda's testimony, we now turn to Bright's claim that there was an impermissible violation of D.R.E. 404(a) rising to the level of plain error. D.R.E. 404(a) provides that evidence of a person's character is not admissible to prove conduct in conformity with a character trait on a particular occasion. D.R.E. 404(b) provides that:

[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

D.R.E. 404(b) forbids the admission of evidence of the "defendant's uncharged misconduct to support a general inference of bad character." *Getz v. State*, Del.Supr., 538 A.2d 726, 730 (1988). Bright was charged with Attempted Murder and Terroristic Threatening. 11 *Del. C.* § 621 provides that a person is guilty of Terroristic Threatening when the "person threatens to commit any crime likely to

result in death or in serious injury to person or property." A person is guilty of an attempt to commit a crime if that person:

(1) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

(2) Intentionally does or omits anything which, under the circumstances as the person believes them to be, is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person.

11 *Del. C.* § 531. To the extent that portions of Dr. Mayeda's testimony would constitute character evidence, that testimony was relevant evidence of Bright's *charged* misconduct. Accordingly, the Superior Court did not commit plain error in admitting Dr. Mayeda's testimony.

### C

Next Bright challenges the admission of seven letters, some in redacted form, written by Bright after his arrest and sent to Ona or one of their children. Bright's counsel objected to the admission of these letters as irrelevant and/or prejudicial. The court admitted the letters over objection finding that the letters evidenced either intent, or guilty knowledge, and after concluding that their probative value outweighed their prejudicial effect. The Superior Court gave limiting instructions regarding the letters at the time of admission and again when charging the jury. The court instructed the jury to utilize the letters for only two purposes: i) in making a determination of Bright's intent; or ii) as evidence of guilty knowledge.

We follow an abuse of discretion standard when reviewing the trial court's decision on the admissibility of evidence. *Williamson v. State*, Del.Supr., 707 A.2d 350, 354 (1998). D.R.E. 404(b) permits admission of other crimes, wrongs or acts for the purpose of establishing intent and knowledge. *Getz*, 538 A.2d at 730. Fur-

ther, even though the other crimes or bad acts usually occur prior to the charged offense, evidence of subsequent bad acts may be admissible for "a material purpose, such as demonstrating a consciousness of guilt." *Id.* at 730 n. 3. The Superior Court did not abuse its discretion in the admission of Bright's letters.

## III

■■■ Bright's final contention on appeal is that the evidence was insufficient as a matter of law to sustain the conviction for Attempted Murder. Bright does not challenge the sufficiency of the evidence with respect to the element of intent, but rather argues that there was insufficient evidence that he took a "substantial step" toward commission of the crime of Murder.

When this Court reviews an insufficiency of the evidence claim, we decide, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Skinner v. State*, Del. Supr., 575 A.2d 1108, 1121 (1990). As noted above, a person is guilty of an attempt to commit a crime if the person "intentionally does or omits anything which, under the circumstances as the person believes them to be, is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person." 11 *Del. C.* § 531(2). A "substantial step" is defined as an "act or omission which leaves no reasonable doubt as to the defendant's intention to commit the crime which the defendant is charged with attempting." 11 *Del. C.* § 532.

The *Delaware Criminal Code with Commentary*, p. 156 (1973) explains that "the point at which there remains no reasonable doubt" as to the defendant's intention to commit the crime is a "jury issue" that will "depend on the surrounding circumstances and on the nature of the crime which is contemplated." The *Commentary* further notes that the steps described in the Model Penal Code may be sufficient under some circumstances, but are not in themselves sufficient under § 532. *Id.* at p. 157. The steps listed which have potential applicability here are: i) searching for the contemplated victim; ii) reconnoitering the place contemplated for the commission of the crime; iii) possession of materials to be employed in the commission of the crime which can serve no lawful purpose of the actor under the circumstances; and iv) possession or collection of such materials at or near the place contemplated for the commission of the crime.

The Superior Court twice ruled that there was sufficient evidence to sustain Bright's conviction for Attempted Murder. *State v. Bright*, Del.Super., No. 9412912391, 1998 WL 283391 at *15, *17–19 (Feb. 4, 1998). We agree. The jury was presented with evidence that left no reasonable doubt of his intention to murder Ona.

First, Bright repeatedly told his psychiatrist that he intended to kill Ona, including that if he could not shoot her that he would strangle her. Bright called his psychiatrist canceling an appointment set for December 9, 1994, and stating that he was leaving Indianapolis immediately for Delaware to kill Ona. Bright was arrested the next night around midnight sixty miles due east from Indianapolis with a loaded handgun, a knife and ammunition. Once released, Bright continued on his way, more than seven hundred miles, arriving only a few days later on December 14, 1994 and registering at two Delaware hotels under assumed names. During this time period, Bright left several threatening phone messages on Ona's answering machine. While in the Delaware area, Bright purchased a knife, clothesline, duct tape, and a sharpening stone. Bright was arrested in the early morning hours of December 16, 1994 at a location between Ona's home and place of work, having told an officer that he was lost and thereafter seeking directions to Ona's house. The jury additionally heard evidence of statements made by Bright just after his arrest that

he "should have killed [his] wife when he had the chance" and he "had spent twenty-six years with [Ona] and he was going to get her and no one was going to stop him."

The issue of whether the defendant has taken a substantial step such that there is no reasonable doubt as to the defendant's intention to commit the crime is a jury issue dependent upon the surrounding circumstances. We hold that, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of Attempted Murder beyond a reasonable doubt.

The judgment of the Superior Court is AFFIRMED.