IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICARDO CASTRO | § | |
| | § | No.  318, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below:  Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID. Nos.   1809014319 (K) |
| STATE OF DELAWARE | § | 1812000589 (K) |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |


Submitted:  September 1, 2021
Decided:  November 15, 2021


Before **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**,
Justices; and **JONES**, Judge,* constituting the Court *en banc*.


Upon appeal from the Superior Court.  **AFFIRMED**


Brian J. Chapman, Esquire, Law Office of Brian Chapman, Wilmington, Delaware;
Daniel J. Auerbach, Esquire (*Argued*), Gamburg and Benedetto, LLC, Philadelphia,
Pennsylvania, for Appellant, Ricardo Castro.

John Williams, Esquire, Department of Justice, Dover, Delaware, for Appellee, State
of Delaware.


**VAUGHN**, Justice, for the Majority:

* Sitting by designation under Del. Const. Art. IV, §12.

The Appellant, Ricardo Castro, appeals from his convictions on two counts of Drug Dealing and two counts of Conspiracy in the Second Degree. He makes three claims on appeal. First, he claims that the Superior Court erred by denying his motion for judgment of acquittal on the two Drug Dealing convictions. Second, he claims that the Superior Court erred by denying his motion for judgment of acquittal on the two Conspiracy convictions. His third claim is that the Superior Court erred in not granting his pre-trial motion to suppress wiretap evidence. For the reasons that follow, we reject Castro's claims and affirm his convictions.

**FACTS AND PROCEDURAL HISTORY**

In 2018, the Delaware State Police conducted a drug investigation, which they named Operation Old School. The targets of the investigation were approximately fifteen individuals involved in a Kent County cocaine drug dealing enterprise. As a result of the investigation, Castro was arrested and indicted by a grand jury on five counts of Drug Dealing. The five counts of Drug Dealing were alleged to have occurred in 2018 on the following five dates or time frames: on or about April 20, on or between May 1-2, on or between May 11-12, on or about June 8, and on or about June 19. Castro was also indicted on five counts of Aggravated Possession, with each count being based on the same factual circumstances as one of the five counts of Drug Dealing. He was also indicted on five counts of Conspiracy in the

2

Second Degree, with each count also being related to one of the five counts of Drug Dealing. Finally, he was indicted for Racketeering.

Castro's trial by jury was held in February 2020. He was convicted of the Drug Dealing alleged to have occurred between May 1-2 and the Drug Dealing alleged to have occurred between May 11-12. He was also convicted of the two Conspiracy in the Second Degree charges, which were related to the May 1-2 Drug Dealing charge and the May 11-12 Drug Dealing charge. He was acquitted of all other charges. Our summary of the evidence will focus on the May 1-2 and May 11-12 charges of which Castro was convicted.

Detective Thomas Lamon, the lead investigator in Operation Old School, testified that Castro was believed to be the person who supplied the enterprise's cocaine in Dover. Co-defendant Lamont McCove was a middleman, who received cocaine from Castro and sold it to ultimate purchasers and lower-level dealers. At Castro's trial, Barry Haith, Jerome Harris, and Brandon McClain were presented as the ultimate buyers and lower-level dealers who bought cocaine from McCove. McCove accepted a plea agreement before trial and testified as a witness for the prosecution. He testified that a typical transaction would go as follows: One of the lower-level participants would contact McCove for cocaine. McCove would then retrieve money from that person and take that money to his supplier, who would give McCove drugs in exchange for the money. McCove would then bring the acquired

3

cocaine to the lower-level person who had ordered it. McCove also testified that Castro was his primary supplier in these transactions.

At the time of the investigation, McCove was employed as an equipment operator for Greggo & Ferrara, Inc., and he drove trucks for the company at a construction site off Route 301 in Middletown, Delaware.

On May 1, 2018, between 6:30 p.m. and 7:30 p.m., the police intercepted several calls and text messages between Haith and McCove indicating that Haith wanted to buy cocaine from McCove. During these calls, Haith asked to purchase a "nina" from McCove.[1] Detective Lamon testified that "nina" means nine ounces of cocaine, which was a typical purchase. Text messages from the following morning also indicate that Haith was asking for nine ounces of cocaine. In those messages, McCove quoted Haith $9,000, which Detective Lamon testified is the going rate for nine ounces of cocaine. On May 1, McCove told Haith that he could not get anything until the next day, but that McCove was planning on meeting his supplier at McCove's workplace in Middletown the next day. McCove and Haith made plans to meet the next morning so that Haith could provide McCove with the money to give his supplier.

On May 2, at about 9:00 a.m., as Detective Matthew Long surveilled Castro's Dover residence, he observed, and recorded via hand-held video camera, Castro get

---

[1] App. To Appellant's Opening Br. at A256 [hereinafter A_].

4

into his car, a black Acura. Detective Long testified that Castro then headed eastbound on Route 8 and got onto Route 1 to go northbound towards Middletown. Detective Lamon testified that Castro met with McCove at the Middletown construction site where McCove was working on May 2.[2] Later that day, at approximately 5:00 p.m., McCove sent a text message to Haith stating that he had been working in Middletown that day and asking where they could meet. Haith responded that McCove could meet him at 302 Cutz, a barbershop in Dover. At 5:52 p.m., video surveillance from a pole camera at or near 302 Cutz showed Haith getting into McCove's car and exiting the car after a short period of time.

Between May 11-12, 2018, McCove received texts and calls from several lower-level dealers who wanted to buy drugs. On May 11, at approximately 7:31 p.m., McClain texted McCove saying "need 1[.]"[3] Detective Lamon testified that McClain's message meant that McClain wanted one ounce of cocaine from McCove.

---

[2] The dissent states that the relevant evidence discloses a "critical gap" in the prosecution's evidence on this point. Detective Lamon did not testify that he personally conducted surveillance at the Middletown site on May 2. He referred to that surveillance as having been conducted by Detective Jeff Levere. When Detective Levere testified he was questioned only about surveillance he conducted at the Middletown site on May 12. Neither the prosecution nor the defense asked him any questions about surveillance conducted at the Middletown site on May 2. The dissent claims that Lamon's testimony about McCove being observed at the Middletown site on May 2 is "mistaken second-hand testimony." We do not agree that the record supports a finding that Detective Lamon's testimony was "mistaken," as Detective Levere was never asked about surveillance at the Middletown site on May 2. Detective Lamon's testimony that McCove was observed at the Middletown site on May 2, while apparently second-hand, was admitted without objection and without being contradicted by other evidence. In deciding a motion for judgment of acquittal, all evidence heard by the jury must be considered in the light most favorable to the State.
[3] *Id.* at A315.

McCove responded that he would be able to get it to him the next day.

Expecting a meeting between McCove and Castro on May 12, Officer Jeff Levere surveilled the area in Middletown where McCove was employed. At around 10:00 a.m., Officer Levere saw Castro's black Acura parked along the southbound lane of Route 301 with its hazard lights activated. Levere observed McCove at the driver's side window of Castro's car. Shortly thereafter, McCove left Castro's car and returned to his dump truck.

Text messages intercepted later that day between McClain and McCove showed that the two discussed where to meet that day after McCove was off work. During a phone call at 2:52 P.M on May 12, McCove and McClain decided to meet at Chase Lounge in Cheswold. Detective Lamon testified that the two did meet at Chase Lounge for approximately two minutes that day.

Later that evening, phone calls recorded between McCove and Harris from 5:44 p.m. and 6:14 p.m. indicated that Harris wished to buy both cocaine and marijuana from McCove. McCove and Harris arranged to meet at a parking lot near the Olive Garden and Red Lobster restaurants in Dover that evening.

While surveilling Castro's home on May 12, Detective Matthew Krough saw Castro and McCove meet there at around 6:45 p.m. He testified that McCove exited his vehicle and got into the passenger seat of Castro's vehicle. Castro was in the vehicle, and both men remained there for a short period of time. They then exited

6

the vehicle and walked around to the front of the vehicle where they spoke for a brief period. Castro then walked to the rear of his residence. McCove returned to his vehicle where he "sat and waited."[4] Castro then returned from his residence and opened the passenger door of McCove's vehicle. After some conversation, Castro shut the passenger door and McCove departed.

At 6:57 p.m., McCove sent a text message to McClain indicating that he would be at the Olive Garden/Red Lobster parking lot in five minutes. At 7:10 p.m., McCove and Harris spoke on the phone and made plans to meet at the Olive Garden/Red Lobster parking lot. Detective Brock Dean followed McCove to the Olive Garden/Red Lobster parking lot around 7:00 p.m. that night.

McCove testified that Castro was his main supplier and that he had received cocaine from him on multiple occasions. He testified, however, that he did not receive cocaine from Castro on May 1-2 or May 11-12. McCove testified that he had met with Castro on those days, but only an exchange of money had occurred. When pressed about his meetings with Castro on May 1-2 and May 11-12, the prosecution asked, "Mr. McCove, the days that you met with Mr. Castro and didn't get drugs, you were paying him for prior transactions for those drugs?"[5] and McCove answered, "Yes."[6] He also testified that he gave McClain one ounce of cocaine that

---

[4] *Id.* at A347-48.
[5] *Id.* at A451.
[6] *Id.*

he "had already"[7] on the evening of May 12, the implication being that he had received that one ounce from another source.

Prior to the trial, Castro moved to suppress evidence that the State obtained from wiretaps of his cell phone that occurred in June 2018. The Superior Court denied Castro's motion. After the trial, Castro moved for a judgment of acquittal on the four charges of which he had been convicted. The Superior Court denied the motion, finding that the jury could reasonably conclude that Castro was guilty of Drug Dealing and Conspiracy on May 1-2 and May 11-12. This appeal followed.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment of acquittal *de novo*.[8] Specifically, this Court examines whether any rational trier of fact, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of the crime.[9] "For the purposes of this inquiry, this Court does not distinguish between direct and circumstantial evidence,"[10] and in cases involving purely circumstantial evidence, the State need not disprove every possible innocent explanation.[11] The inquiry is not a search for reasonable doubt.

---

[7] *Id.* at A444.
[8] *Ways v. State*, 199 A.3d 101, 106 (Del. 2018).
[9] *Id.* at 106-07; *Gronenthal v. State*, 779 A.2d 876, 879 (Del. 2001).
[10] *Ways*, 199 A.3d at 107 (quoting *Cline v. State*, 720 A.2d 891, 892 (Del. 1998)).
[11] *Monroe v. State*, 652 A.2d 560, 567 (Del. 1995).

8

## DISCUSSION

### I.

Castro first claims that the Superior Court erred by denying his motion for judgment of acquittal on the two Drug Dealing offenses alleged to have occurred on May 1-2 and May 11-12. To convict Castro of Drug Dealing the State was required to establish that on the dates in question Castro knowingly delivered and/or possessed with intent to deliver 25 grams or more of cocaine. Castro argues that there is no evidence that he possessed drugs on those dates and that McCove testified that only money, not cocaine, changed hands on those dates. We think, however, that a juror viewing the evidence in the light most favorable to the State could rationally conclude that Castro was guilty of Drug Dealing beyond a reasonable doubt on the dates in question.

McCove testified that Castro was continuously involved in the drug operation, that he, McCove, was a middleman between Castro and McCove's buyers, and that Castro was his main cocaine supplier.[12] The jury heard evidence, supported by wiretaps and text messages, that on the dates in question McCove received calls

---

[12] The dissent states that McCove did not explain or quantify how frequently he bought cocaine from Castro in relation to other suppliers. The dissent mentions Richard McDougall, one of McCove's other suppliers, and a text message which McCove sent to McDougall on May 1. The evidence appears to indicate that McDougall operated out of Philadelphia, and, apart from the just mentioned May 1 text, there does not appear to be evidence indicating that McDougall was involved in the May 1-2 and May 11-12 transactions. The testimony that McCove had other suppliers does not undermine his testimony that Castro was his main supplier.

9

and/or texts from his buyers in which they asked him to sell them cocaine. Phone calls and text messages from May 1 showed that Haith wanted to purchase nine ounces of cocaine, and that McCove and Haith planned on meeting the morning of May 2 so that McCove could collect $9,000 from Haith to make the deal. Testimony at trial showed that McCove also met with Castro that morning at McCove's work location at Middletown. Text messages and surveillance showed that McCove and Haith then met at a Dover barbershop that evening. Based on the evidence, a juror could rationally conclude beyond a reasonable doubt that when Castro headed towards Middletown the morning of May 2 and met with McCove at his worksite, it was to exchange Haith's money for nine ounces of cocaine, which McCove then delivered to Haith at a Dover barbershop later that day.[13]

On May 11-12, text messages and phone calls recorded McCove receiving a request from McClain for one ounce of cocaine on May 11. Surveillance showed that McCove met with Castro the morning of May 12 at McCove's work location in Middletown. Text messages between McClain and McCove showed that they agreed to meet in Cheswold that afternoon. Surveillance showed that they did in

---

[13] The dissent states that there is no evidence that McCove delivered cocaine to Haith when the two met at 302 Cutz Barbershop on May 2. It supports this statement, in part, by pointing to testimony from McCove that he met Haith at the barbershop to go "to have drinks at Classics." From the pole camera surveillance video, however, showing Haith getting into McCove's vehicle and then getting out after a short time, the jury could conclude that the parties completed their planned drug transaction at the barbershop at that time, and that McCove's reference to going to have drinks with Haith at Classics was not credible.

fact meet there.  Later that same day, phone calls between McCove and Harris between 5:44 p.m. and 6:14 p.m. showed that Harris desired to buy cocaine and marijuana.  They agreed to meet at the Dover Olive Garden/Red Lobster parking lot later that evening.  Surveillance then showed McCove meeting Castro at Castro's residence at approximately 6:45 p.m.  After that meeting, McCove texted Harris that he was on his way to the Olive Garden/Red Lobster parking lot and surveillance confirmed that he did go to that location.  Based on the evidence, a juror could rationally conclude beyond a reasonable doubt that on May 12 McCove delivered drugs to McClain and Harris, which he had received from Castro earlier that day.[14]

The jury was not required to credit McCove's testimony that he exchanged only money with Castro on the two sets of dates in question or that the ounce he said he gave McClain May 12 was one he "had already."  It is the jury's role as fact-finder to determine witness credibility and resolve conflicts in the testimony.[15]  The jury apparently concluded that McCove, Castro's alleged co-conspirator, was either

---

[14] One of the points made by the dissent is that no cocaine or other physical evidence was recovered pertaining to the May 1-2 or May 11-12 transactions.  The absence of physical evidence of these transactions is explained by the fact that the police were conducting an ongoing investigation, Operation Old School.  The investigation entailed surveilling suspected drug activity without interrupting that activity while the investigation was in progress.  An ongoing investigation such as the one involved here continues until such time as the police decide that the time has come to conclude the investigation and make arrests.  Direct evidence of a crime is not required to sustain a conviction.  Indirect or circumstantial evidence is sufficient to sustain a conviction if the circumstances are sufficient to lead the jury to conclude that the accused committed the crime beyond a reasonable doubt.  The law makes no distinction between direct and circumstantial evidence.
[15] *Johnson v. State*, 983 A.2d 904, 936 (Del. 2009).

mistaken when he testified that only money exchanged hands on those specific dates, or the one ounce delivered to McClain on May 12 was one he "had already," in view of all the other evidence, or that he was being untruthful. What weight, if any, to be given McCove's testimony on these points was a matter for the jury to determine.[16]

Castro also argues that since there was no evidence that he possessed drugs on the dates in question, there is no evidence that he possessed the minimum of 25 grams needed to establish Drug Dealing. At trial, Detective Lamon testified that a half kilogram (or 500 grams) of cocaine is approximately 18 ounces. From this it follows that one ounce is approximately 28 grams. In its closing argument, the State argued, without objection, "We also know from Detective Lamon, if there was any question about the math, that one ounce is approximately 28 grams." Accordingly, there was evidence that the cocaine that the jury found McCove obtained from Castro in the May 1-2 transaction and in turn delivered to Haith, and the one ounce of cocaine that the jury found McCove obtained from Castro in the May 11-12 transaction and in turn delivered to McClain exceeded the minimum 25 grams

---

[16] The dissent believes that we give little weight to the requirement that sufficient evidence of guilt is evidence that establishes guilt beyond a reasonable doubt, and the evidence in this case creates at most a strong suspicion of the defendant's guilt. We are satisfied, however, that the evidence is sufficient under the standard of review which we apply. We do not determine the weight of the evidence. *Edwards v. State*, 285 A.2d 805 (Del. Super. 1955). We do not determine the credibility of witnesses or make findings of fact. We determine a legal question: Whether *any rational* trier of fact *could find* the defendant guilty beyond a reasonable doubt viewing the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the State.

12

threshold required for Drug Dealing.[17]

## II.

Castro's second claim is that the Superior Court erred by not granting his motion for judgment of acquittal on the two convictions for Conspiracy in the Second Degree. This claim is based solely on the argument that no conspiracy to commit drug dealing could exist because no drugs changed hands on the dates in question. Accordingly, the claim rises or falls with his claim that the Superior Court erred by not granting his motion for judgment of acquittal on the two Drug Dealing convictions. Since we have concluded that Castro's claim regarding his Drug Dealing convictions fails for the reasons set forth hereinabove, his claim regarding his conspiracy convictions fails as well.

## III.

Castro's third claim is that the Superior Court erred by not granting his motion to suppress wiretap evidence. The wiretap order for Castro's cell phone was issued on June 4, 2018, and any evidence collected pursuant to that order was, therefore, collected after that date. Neither party has made any claim that evidence collected from that order had any bearing or relevance upon his convictions for the events of

---

[17] The indictment alleged and the trial court instructed the jury that Tier 3 Drug Dealing requires a finding that the Defendant possessed at least 20 grams of cocaine, rather than the statutorily required 25 grams, without objection from the Defendant. The Defendant concedes that "[t]he difference between 20 grams and the statutorily mandated grams is irrelevant[,]" Appellant's Opening Br. 14, because his argument is that there was no evidence of any quantity of cocaine.

13

May 1-2 and May 11-12, 2018.  Therefore, it would appear that any error contained in the wiretap order for Castro's cell phone, if any, is harmless.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is **AFFIRMED**.

**TRAYNOR**, Justice, dissenting:

I respectfully dissent from Section I of the majority opinion because I do not believe that a rational juror, viewing the evidence in the light most favorable to the State, could find beyond a reasonable doubt that on the dates in question Castro committed the acts that form the elements of drug dealing as charged here—delivery or possession with intent to deliver 20 grams or more of cocaine. I would therefore reverse and remand the case to the Superior Court for the entry of a judgment of acquittal in favor of Castro as to the two drug dealing charges.

I

As the majority opinion clearly delineates, the first offense under consideration was alleged to have occurred on or between May 1 and May 2, 2018, and the second on or between May 11 or May 12. On neither of those occasions was the cocaine or any other physical evidence recovered. Because of this, the jury did not hear any testimony or consider any forensic evidence establishing that the substance at the heart of the alleged transaction was cocaine of a particular weight— evidence typically central to drug prosecutions. Likewise, on neither occasion did the police or any other witness observe Castro in possession of cocaine, nor did anyone claim to have seen any hand-to-hand transactions between Castro and McCove. To the contrary, the only testifying witness with personal knowledge of what occurred on the occasions when the police saw Castro and McCove together—

15

that is, McCove himself—refuted the investigating officers' suspicions that those encounters entailed drug exchanges.

Instead of physical evidence and percipient-witness testimony, the State's argument rests on a series of speculative inferences that, to borrow from our civil jurisprudence, might be "reasonably conceivable," but which does not constitute proof beyond a reasonable doubt, even when viewed through Rule 29's deferential lens. These inferences depend, in large part, on the purported correspondence between McCove's description of how "a typical transaction would go"[18] and what the police observed on May 1-2 and May 11-12. This characterization is based on McCove's testimony that, in addition to his construction job, he derived income from selling drugs as a "middleman" and that Castro was his "primary supplier."[19] But McCove promptly qualified that statement, noting that he also bought cocaine from other suppliers. McCove never explained or quantified how frequently—in relation to other suppliers—Castro was the source of the cocaine McCove would sell to others.

McCove was clear, however, that, although Castro supplied the cocaine to McCove in furtherance of the April 20 transaction and the two June transactions, he did not supply or deliver cocaine on or between May 1 and May 2 or between May

---

[18] Maj. Op. at 3.
[19] App. to Opening Br. at A431.

11 and May 12, as charged in the indictment. And as to the May 1-2 transaction, this testimony is consistent with a text message McCove sent to one of his other suppliers, Richard McDougal, on May 1, after Barry Haith asked for a price on 18 ounces (a "double") of cocaine. Within minutes of receiving that request, McCove texted McDougal: "18 how much. Cash and no waiting. . . ."[20]

If McCove's testimony were the only crack in the prosecution's foundation, I would agree with the majority's conclusion regarding the sufficiency of the evidence. But just because McCove's denial of the central fact upon which Castro's convictions rest—a denial that stands in contrast to his testimony incriminating Castro in the April and June drug deliveries—is not sufficient to warrant entry of a judgment of acquittal, that does not mean that it is irrelevant to the rationality of a finding of guilt beyond a reasonable doubt. Indeed, it seems to me that, in a prosecution that relies heavily on a "typical" pattern of conduct from which there were an untold number of deviations, McCove's testimony that the pattern was not followed on the relevant dates is particularly relevant.

But there's more. I will start with the drug-dealing count that charges Castro with delivering or possessing with intent to deliver 20 grams or more of cocaine on or between May 1 and May 2, 2018. Central to the Superior Court's denial of Castro's motion for judgment of acquittal on this count was Detective Lamon's

---

[20] *Id*. at A446; Def.'s Ex 2.

testimony that McCove, having received Haith's request to buy a "nina" on the evening of May 1, met with Castro at the Middletown construction site on May 2. Likewise, the majority cites this testimony in its analysis. But a careful review of all the relevant testimony discloses a critical gap in the prosecution's evidence on this point.

To be sure, Detective Lamon testified that, on May 2, McCove acquired the cocaine that he later delivered to Haith from Castro at the Middletown construction site. But Lamon did not observe this meeting; he was merely reporting what he believed that other surveilling officers—Detectives Long and Levere—saw. Detective Long's surveillance was unremarkable. He followed Castro from a residence in Dover and watched as "he traveled eastbound on Route 8 and got onto Route 1 to go northbound towards the Middletown area."[21] Route 1 northbound would also take Castro toward Wilmington where he was employed—and worked that day—as a DART bus driver. In any event, that is where Long's surveillance of Castro ended.[22]

According to Detective Lamon, Detective Levere picked up the surveillance in Middletown.[23] For that reason, after Detective Lamon noted Detective Levere's role during direct examination, the prosecutor moved on, announcing in the jury's

---

[21] *Id*. at 306.
[22] *Id.*
[23] *Id*. at 308.

18

presence that "the jury will hear from Detective Levere tomorrow."[24]  But when Detective Levere appeared the following day, he testified that the surveillance he conducted at the Middletown location occurred on May 12, not on May 2.  Thus, this critical factual underpinning of the Superior Court's and the majority's analysis of the evidence is based on Detective Lamon's mistaken second-hand testimony.

In a similar manner, the record is devoid of any evidence that McCove delivered cocaine to Haith when the two met at the 302 Cutz barbershop in Dover.  Despite the fact that McCove was a cooperating witness—who, it is worth repeating, was willing to implicate Castro on other counts—when asked about the purpose of his meeting with Haith at the barbershop, he replied: "Going to have drinks at Classics."[25]  And instead of pressing McCove on whether he was also completing a drug transaction, the prosecutor moved on to another topic.  As a result, there is no evidence that the transaction Haith initiated on the evening of May 1 ever came to fruition.

I accept the majority's observation that the jury was not required to credit McCove's testimony where it ran contrary to the prosecution's theory of the case.[26]  But as I see it, the majority would not only allow the jury to reject McCove's testimony where it exculpates Castro but also to spin that rejection into proof of its

---

[24] *Id.*

[25] *Id.* at A443.

[26] Maj. Op. at 10.

19

opposite. In the context of this case in which the jury found Castro not guilty of the April and June counts despite McCove's testimony that Castro was his supplier in connection with those transactions, I fear that is what the jury might have done.

I turn next to the count charging Castro with delivering or possessing with intent to deliver 20 or more grams of cocaine on or between May 11 and May 12, 2018. Like the State's purported proof of drug dealing between May 1 and May 2, its evidence in support of this count consists of intercepted communications and the movements of various individuals that were, according to the State, consistent with a typical drug transaction as described by McCove. Here, though, police were able to confirm that McCove met with Castro after receiving two requests from buyers and before McCove met with those buyers. But again, McCove denied that he received any drugs from Castro on this occasion, the surveilling officers did not witness anything changing hands between Castro and McCove, and no drugs were recovered, tested, or weighed.

Allowing this quantum of evidence to suffice for a conviction of drug dealing, in my view, undermines the reasonable doubt component of our Rule 29 standard. It may be true, as the majority posits, that "[t]he inquiry [here] is not a search for reasonable doubt."[27] But the trial court still must determine whether, after considering the evidence and its inferences in the light most favorable to the State,

---

[27] *Id.* at 8.

20

rational triers of fact could find the defendant guilty beyond a reasonable doubt. Here, the majority gives little weight to the important function served by this last, but certainly not least, component of our Rule 29 standard.

To be clear, I do not doubt that the investigating officers suspected that, when McCove met with Castro on the relevant dates, Castro delivered drugs to McCove. The problem for the prosecution is that the facts that might justify those suspicions were not borne out by evidence produced at trial. The only evidence offered at trial by the State touching upon what happened during the meetings—the testimony of its cooperating witness, McCove himself—points in the other direction.

Keep in mind here that the meetings occurred under police surveillance. But none of the surveilling officers witnessed anything during the meetings—no hand-to-hand exchanges, no furtive or suspicious gestures, no apparent concealment of contraband—that would tend to corroborate their suspicions. And McCove, the only participant in or observer of the meetings to testify—who did not shy away from incriminating Castro as to the April and June drug transactions—unequivocally denied that, on the dates relevant to this appeal, Castro delivered any drugs to him.

As this Court remarked in *White v. State*, "[i]inferences from circumstantial evidence are not limitless."[28] To paraphrase *White*, the circumstances may have created a strong suspicion that the meetings between Castro and McCove involved

---

[28] 906 A.2d 82, 88 (Del. 2006).

21

exchanges of cocaine in a quantity sufficient to satisfy the expectations of McCove's buyers, "but mere suspicion, however strong, is insufficient for a criminal conviction."[29]

## II

I concur in the majority's conclusion that the Superior Court did not err when it denied Castro's motion for judgment of acquittal on the two conspiracy counts but for different reasons than are set forth in the majority opinion. Under both of those counts, the indictment alleges that Castro and McCove "with intent to promote or facilitate the commission of a felony, did agree with each other to engage in conduct constituting the felony of Drug Dealing and one or more conspirators did commit an overt act in the furtherance of said conspiracy."[30]

McCove testified that on May 1[31] and May 11[32] he met with Castro and gave him money that he owed in connection with their prior drug transactions.[33] Although the May 1 payment cannot be linked to the May 1-2 transaction (the payment was on the morning of May 1, and Haith's request for the "nina" was not made until 7:30 that evening), the indictment does not specifically tie the payment to McCove's May 2 delivery to Haith. These payments are overt acts that, when coupled with ample

---

[29] *Id*. at 89.
[30] App. to Opening Br. at A30, A33.
[31] *Id.* at A439–444.
[32] *Id.* at A445.
[33] *Id*. A451.

evidence of Castro and McCove working together to distribute cocaine in April and June, are sufficient to support Castro's conspiracy convictions.

## III

I concur in Section III of the majority opinion.