**Jan WHITE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 582, 2005.**

Supreme Court of Delaware.

Submitted: Aug. 16, 2006.
Decided: Sept. 14, 2006.

Thomas D. Donovan, Schwartz & Schwartz, Dover, Delaware, for appellant.

John R. Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices.

STEELE, Chief Justice for the Majority.

After an extensive investigation of James White, the police executed a search warrant for his apartment. In doing so, the police found Ebony Russell, (James's girlfriend), Jan White (who is James's mother and the defendant appellant) and Eric Coleman (Jan's husband) standing near the walk-in closet of the master bedroom.[1] Jan had been staying with James at his apartment for several weeks because she had recently undergone leg surgery. Jan slept in the master bedroom and all of her possessions found on the premises were in bags on the master bedroom floor. The police found nothing of hers in the walk-in closet.

During the search the police found in the walk-in closet, among other things, 177 grams of *white powdered* cocaine, $1202 in cash in a men's shoe box, 6.5 grams of uncolored crack cocaine in a women's shoe, and 3.16 grams of marijuana. The police

---

1. To avoid confusion between James White and Jan White we refer to them by their first names. We refer to Ebony Russell and Eric Coleman by their last names and we refer to the master bedroom walk-in closet as "walk-in closet."

also searched Jan's person and found 4.63 grams of *pink* crack cocaine in her right sock. The State prosecuted Jan for Trafficking in Cocaine over 100 grams and Conspiracy to Traffic in Cocaine. Those charges were based on the white powdered cocaine found in the walk-in closet. Jan was also prosecuted on several other charges. The case went to a trial before a jury.

At the close of the State's case, Jan moved for a Judgment of Acquittal on all counts. The trial judge denied the motion. The jury ultimately found Jan guilty of five crimes, including Trafficking in Cocaine over 100 grams and Conspiracy to Traffic in Cocaine. She appeals the trial judge's denial of her motion with respect to those two charges only. We find, based on the evidence presented, that no rational jury could find *beyond a reasonable doubt* (1) that Jan exercised dominion and control over the cocaine found in the walk-in closet, or (2) that Jan agreed to aid or abet James in his drug operation. Therefore, we must conclude that the trial judge erred by denying her Motion for Judgment of Acquittal with respect to the charges of Trafficking in Cocaine over 100 grams and Conspiracy to Traffic in Cocaine. Accordingly, we vacate those convictions.

## I. Facts and Procedural History

In January of 2003, the City of Dover Police Department began investigating James White for possible involvement in selling drugs. James lived in an apartment that his girlfriend, Russell, leased. Their apartment was located less than 500 feet from a school. During the investigation the police made controlled drug purchases inside the apartment.

On January 29, 2004, about one year after the police investigation began, the Dover Police Department executed a search warrant at the apartment. When the police entered the apartment they discovered Russell, Jan, and Coleman standing near the walk-in closet. James, the subject of the police investigation, was not present. Coleman and Russell properly identified themselves to the police, but Jan falsely claimed that her name was Jaya Parker. Jan also falsely claimed that she was James's aunt rather than his mother.

During the search of the residence the police found: 177 grams of white powdered cocaine and $1,202 in cash inside a man's shoebox in the walk-in closet; 3.16 grams of marijuana inside a man's shoe in the walk-in closet; 6.5 grams of uncolored crack cocaine inside a woman's shoe in the walk-in closet; cocaine residue in the top drawer of the dresser in the master bedroom; a homemade crack pipe in the master bedroom's smaller closet; a pot with untested, unidentified white residue in James's and Russell's kitchen sink; and a digital scale inside a food box in their kitchen.

The police found all of Jan's personal belongings on the premises in trash bags on the master bedroom floor. The police also found a spoon and a scouring pad, which are typically used by drug users, in Jan's black bag on the master bedroom floor. Jan informed the police that she had been staying with James for several weeks while she recovered from her recent leg surgery. The chief investigating officer testified at trial that Jan's statement about her surgery seemed true based on his observation of Jan's leg and the presence of a wheelchair. The police later searched Jan's person. In her right sock they found eight small baggies containing a total of 4.63 grams of pink colored crack cocaine. The police arrested Jan, who continued to claim that she was Jaya Parker, and who signed the formal court documents as Jaya Parker. Later, the police

discovered that she was actually Jan White.

On January 7, 2004, the State indicted Jan on one count of Forgery in the Second Degree, one count of Criminal Impersonation, one Count of Making a False Written Statement, one count of Trafficking in Cocaine Over 100 grams, one count of Possession with Intent to Deliver a Narcotic Schedule II Controlled Substance (Cocaine), one count of Maintaining a Dwelling for Keeping Controlled Substances, one count of Possession of a Narcotic Schedule II Controlled Substance (Cocaine) within 1000 feet of a School, one count of Conspiracy Second Degree to Engage in Felony Criminal Conduct (Conspiracy to Traffic in Cocaine), one count of Possession of Drug Paraphernalia, and one count of Possession of a Non-narcotic Schedule I Controlled Substance (Marijuana).

The State later entered a *nolle prosequi* on three counts: Forgery in the Second Degree, Making a False Written Statement, and Possession of Drug Paraphernalia. On June 2, 2005, a jury trial began on the remaining charges. At the close of the State's case, Jan moved for a Judgment of Acquittal on all remaining charges. The trial judge summarily denied Jan's motion and stated: "In the anticipation of having considered those issues, I overrule the motion."

On June 8, 2005, the jury returned a verdict finding Jan guilty of: Criminal Impersonation, Trafficking in Cocaine Over 100 grams, Possession with Intent to Deliver Cocaine, Possession of Cocaine within 1000 feet of a School, and Conspiracy Second Degree to Engage in Felony Criminal Conduct (Traffic in Cocaine). The jury acquitted Jan of Possession of Marijuana (that was found in the walk-in closet), and "hung" on Maintaining a Dwelling for Keeping Controlled Substances. A Superior Court judge sentenced Jan, under 11 Del. C. § 4214, as follows: one year at Level V, suspended for 18 months at Level III for Criminal Impersonation, ten years at Level V with credit for 144 days already served for Trafficking in Cocaine Over 100 grams, three years at Level V for Possession with Intent to Deliver Cocaine, one year at Level V for Possession of Cocaine within 1000 feet of a School, and one year at Level V for Conspiracy.[2] Jan appeals the trial judge's denial of her motion for a Judgment of Acquittal on the charges of Trafficking in Cocaine Over 100 grams and Conspiracy.[3]

## II. Discussion

■ We review *de novo* a trial judge's denial of a criminal defendant's Motion for Judgment of Acquittal to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crimes charged *beyond a reasonable doubt*.[4] We will address each challenged conviction separately.

### 1. Trafficking in Cocaine Over 100 grams

■ 16 Del. C. § 4753A(a)(2) defines trafficking in cocaine:

---

2. The Superior Court judge also imposed several fines.

3. Jan's counsel conceded at oral argument that the trial judge properly denied Jan's Motion for Judgment of Acquittal with respect to the charges of Criminal Impersonation, Possession with Intent to Deliver Cocaine, and Possession of Cocaine within 1000 feet of a School. In any event, there is clearly record evidence to support the trial judge's decision to deny Jan's motion for judgment of acquittal with respect to these charges.

4. *Priest v. State*, 879 A.2d 575, 577 (Del.2005).

Any person who, on any single occasion, knowingly sells, manufactures, delivers or brings into this State, or who is knowingly in actual or *constructive possession* of, 10 grams or more of cocaine or of any mixture containing cocaine, as described in § 4716(b)(4) of this title, is guilty of a class B felony, which felony shall be known as "trafficking in cocaine." If the quantity involved ... [i]s 100 grams or more, such person shall be sentenced to a mandatory minimum term of imprisonment of 8 years and to pay a fine of $ 400,000.

The State contends that a rational jury could have found Jan guilty of Trafficking in Cocaine over 100 grams because she actually possessed 4.63 grams of pink cocaine in her right sock and *constructively possessed* the additional 177 grams[5] of cocaine found in the master bedroom walk-in closet. Jan does not dispute that she actually possessed the 4.63 grams of pink crack cocaine found in her sock. She contends, however, that no rational jury could have found that she constructively possessed the 177 grams of white powdered cocaine found in the walk-in closet based on the circumstantial evidence admitted at trial.

 The required showing to establish constructive possession is well settled: [T]o establish constructive possession, the State must present evidence that the defendant: (1) knew the location of the drugs; (2) had the ability to exercise dominion and control over the drugs; and (3) intended to guide the destiny of the drugs. ... . Evidence of a defendant's constructive possession may be proven

exclusively through circumstantial evidence since this Court no longer distinguishes between direct and circumstantial evidence in a conviction context.[6]

Here, no rational jury could find *beyond a reasonable doubt* that Jan exercised dominion and control over, or "intended to guide the destiny of," the white powdered cocaine found in the walk-in closet. Jan was only a temporary guest at, not a resident of, her son's home. She had stayed there for "several weeks" and left all of her belongings on the master bedroom floor. The chief investigating officer's testimony, moreover, is consistent with only one conclusion—that Jan never had dominion and control over the walk-in closet. The CIO testified that the entire master bedroom, including the smaller closet "for lack of a better term was a mess." He also stated, however, that the walk-in closet was "orderly." This testimony leads to the conclusion that after Jan came to her son's apartment to recover from surgery, she used only the master bedroom and the small closet. While the facts establish Jan's use of the master bedroom, the evidence does not establish that she exercised dominion and control over the walk-in closet or its contents. Not a single item found in the walk-in closet could be identified as hers, nor did any physical evidence establish that she had ever entered that closet.

 This finding is consistent with our ruling in *Holden v. State*[7] that mere proximity to, or awareness of drugs is not sufficient to establish constructive possession. In *Holden*, the police stopped a vehicle owned and operated by Holden

---

5. There was an additional 6.5 grams of crack cocaine in the walk-in closet. The State, however, indicted Jan for Trafficking in Cocaine over 100 grams so the case depends on whether a rational jury could have concluded that Jan constructively possessed the 177 grams of cocaine.

6. *Hoey v. State,* 689 A.2d 1177, 1181 (Del. 1997).

7. 305 A.2d 320 (Del.1973).

based on an informant's tip.[8] Defendant Brown was the front passenger, and Defendant Griffith was one of two back seat passengers.[9] During a search of the vehicle, "the police found on the back seat a paper bag in which there was a container of Chinese food. Buried in the food was a plastic bag containing 'uncut' heroin weighing 25 1/2 grams ..."[10] A search of Holden revealed a large amount of cash.[11] The police also found several small scales, generally used for weighing drugs, in Holden's seat.[12] Holden, Griffith, and Brown all testified that they were in New York for the day for amusement and that none used heroin nor knew anything about the heroin in the food.[13] A jury found Griffith guilty of possession of heroin and found Holden and Brown guilty of possession with intent to sell heroin.[14] They appealed, claiming that the State presented insufficient evidence to establish that they "possessed" the heroin.[15] We reversed Griffith's and Brown's convictions and stated:

> The State's evidence fails to meet that burden of proof in the cases against Brown and Griffin. The evidence shows only that Brown and Griffin were passengers in the automobile sitting close to the concealed drugs. Such evidence, without more, is insufficient to establish the "possession" prohibited by the Law. While it may be inferred from the evidence that Brown and Griffin were aware of the presence of the drug in the car, there is nothing to show that they had any "dominion, control, and authority" over the drug or the automobile in which it was found. The circumstances may have created a strong suspicion that Brown and Griffin were more than passengers; but mere suspicion, however strong, is insufficient for criminal conviction.[16]

We also found that the State presented sufficient evidence to convict Holden of possession with intent to sell heroin and stated:

> Holden was the owner and operator of the automobile in which the drugs were found. The law places a heavier burden upon the custodian of the automobile than upon a mere passenger in this respect. This Court has held that the custodian of an automobile is presumed, by reason of his status as custodian, to have dominion and control of contraband found in the automobile; and that if, under the totality of the circumstances, such dominion and control may be found to be a conscious dominion and control, the evidence is sufficient to warrant the conclusion of "possession" as to the custodian.
>
> [T]he evidence adduced by the State was sufficient to support the conviction of Holden. The totality of the circumstances—his car, his "trip" to New York, the unexplained large sum of money on his person, the unexplained drug scales in his seat—were sufficient to justify the finding of conscious dominion and control and resultant "possession". All of this, plus the evidence of the large quantity of drugs found in the possession of a nonuser, was sufficient evidence to justi-

8. *Id.* at 321.

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id* at 321–22.

fy the jury's verdict of guilt of possession with intent to sell.[17]

Attempting to distinguish *Holden*, the State suggests that here sufficient circumstantial evidence established more than Jan's mere proximity to the drugs. The State points to the following evidence as sufficient circumstantial proof to allow a rational jury to conclude that Jan exercised actual dominion and control over the cocaine in the walk-in closet and that she intended to "guide the destiny of" the white powdered cocaine: (i) Jan was standing in front of the walk-in closet when the police executed the search warrant; (ii) there was cocaine residue on a dresser in the master bedroom; (iii) Jan had a spoon and a scouring pad in her bag in the master bedroom and a homemade crack pipe in the small closet in the master bedroom; (iv) there was a pot with white untested residue in James's kitchen sink; (v) there was a digital scale in a food box in James's kitchen; (vi) Jan provided a false name to the police; and, (vii) Jan had individually packaged pink crack cocaine (different from the white powdered cocaine in the closet) in her sock.

We disagree. Inferences from circumstantial evidence are not limitless. The cocaine residue on the dresser, the spoon and scouring pad, and the homemade crack pipe in the master bedroom she temporarily occupied, are all consistent with personal drug use rather than drug trafficking. That evidence certainly supports the probability that Jan used crack cocaine. But, no rational jury could use that evidence to conclude that she exercised dominion and control over, and intended to guide the destiny of, the 177 grams of white powdered cocaine found in the walk-in closet. A police officer's testimony that

such a large quantity of cocaine was consistent with drug sales, and the presence of a digital scale in James's food box and a pot in James's sink with untested white residue does nothing more than establish that Jan may have seen, or had access to, paraphernalia that James used in *his* ongoing drug operation.

That Jan had eight individual bags of pink crack cocaine in her sock and that she was found standing in the bedroom where she slept in front of that bedroom's walk-in closet, does not establish that she had dominion and control over the contents of that walk-in closet. The State argues that a rational jury could have drawn a connection between the white powdered cocaine in the walk-in closet and the pink crack cocaine found in Jan's right sock, and then inferred from that relationship that Jan exercised dominion and control over, and intended to guide the destiny of, the white powdered cocaine that police found in the walk-in closet. We cannot agree that a rational jury could fairly infer any logical connection between the 4.63 grams of pink crack cocaine found in Jan's sock[18] and the 177 grams of white powdered cocaine found in the walk-in closet.

In suggesting that a rational juror could infer that Jan recently took 4.63 grams of cocaine from the closet, cooked and dyed it in the pan found in her son's kitchen sink and transformed it into pink crack cocaine as a part of a larger drug trafficking operation, the State asks too much. From that inference the State then proceeds to suggest that a juror could fairly conclude that Jan had access to, knowledge of, and dominion and control over and an intent to, guide the destiny of the contents of the walk-in closet. Although a police officer testified that drug sellers sometimes cook

---

17. *Id.* at 322.

18. It is worth reemphasizing that Jan was prosecuted and convicted for the drugs found in her sock.

and then dye drugs with food coloring, the police found no food coloring in the house and no traces of food coloring in or on the pot during their exhaustive search of James's home. In fact, all that the police found was *"white* 'untested' residue" in the pot. Thus, no rational jury could fairly infer a connection between the white powered cocaine in the walk-in closet, her son's pot with unidentified white "residue," and the pink crack cocaine in Jan's sock, as a basis to establish that Jan either constructively possessed the white powdered cocaine in the walk-in closet or engaged in a conspiracy to traffic in cocaine.

■ The State also claims that the jury could have reasonably concluded that Jan exercised dominion and control over the drugs in the walk-in closet because she was standing in front of that closet when the police arrived and because that by giving a false name she demonstrated consciousness of guilt. Only proximity to the 177 grams of white powdered cocaine can be established from Jan's presence in front of the walk-in closet. The fact that she gave a false name demonstrates no more than Jan's consciousness of guilt of possessing the pink crack cocaine in her sock. Viewing all the evidence in a light most favorable to the State, Jan's use of a false name and her proximity to the walk-in closet could not lead a rational jury to conclude at all, much less *beyond a reasonable doubt,* that she exercised dominion and control over and intended to guide the destiny of white powdered cocaine found in a walk-in closet that belonged to James and Russell and that neither contained any of Jan's belongings nor revealed any evidence she had ever entered it. The master bedroom and the small closet therein (all places where Jan did exercise control) were "a mess." The walk-in closet, however, was neatly organized. The circumstances may have created a strong suspicion that Jan knew the contents of and that she had access to the walk-in closet; but mere suspicion, however strong, is insufficient for a criminal conviction.[19] Even circumstantial evidence must give rise to inferences that raise more than mere suspicion.

■ In reaching our conclusion we have reviewed our earlier drug cases involving challenges to the sufficiency of evidence for constructive possession. After we compared the evidence of constructive possession presented in these earlier cases where we found sufficient evidence to find that a defendant constructively possessed drugs *beyond a reasonable doubt* to the evidence presented in this case, we conclude the State's case against Jan for trafficking in cocaine is exceptionally thin.[20]

19. *Holden,* 305 A.2d at 322.

20. *See e.g., Fletcher v. State,* 873 A.2d 1099, 2005 Del. LEXIS 124, at *4 (Del.2005) (ORDER) (finding sufficient evidence to find that a front passenger in an automobile constructively possessed cocaine when the police found cocaine in the glove box and the driver of the vehicle testified that she heard the glove box close and saw the passenger fumbling with something); *Carter v. State,* 839 A.2d 665 (Del.2003)(ORDER) (finding sufficient evidence to find that the defendant constructively possessed drugs when, at 6:00 a.m., the police conducted a search of defendant's bedroom, where only he slept, and found drugs in the pants next to the bed where he was sleeping); *Hoey,* 689 A.2d at 1179 (finding sufficient evidence to find that Hoey constructively possessed cocaine where a police officer witnessed what appeared to be Hoey collecting money from drug buyers and Hoey's companion, who was sitting near Hoey, giving the drugs to the buyers); *Reid v. State,* 608 A.2d 729, 1992 Del. LEXIS 26, at *3 (Del.1992) (finding sufficient evidence to establish that the defendant constructively possessed drugs found in a bush where the police officer testified that on three occasions he watched the defendant retrieve something from the bush and give it to individuals after

In sum, no juror could reasonably find that Jan exercised dominion and control over and intended to control the destiny of the large quantity of white powdered cocaine found in the walk-in closet.[21] The circumstantial evidence presented might have enabled a rational jury to conclude that it was more likely than not that Jan knew there was cocaine in the walk-in closet[22] but no rational jury could have concluded *beyond a reasonable doubt* that she exercised dominion and control over it. Accordingly, we conclude that Jan's conviction for Trafficking in Cocaine over 100 grams must be vacated.

### 2. Conspiracy to Trafficking in Cocaine

A person is guilty of conspiracy when: [I]ntending to promote or facilitate the commission of a felony, the person: (1) Agrees with another person or persons that they or 1 or more of them will engage in conduct constituting the felony or an attempt or solicitation to commit the felony; or (2) Agrees to aid another person or persons in the planning or commission of the felony or an attempt or solicitation to commit the felony; and the person or another person with whom the person conspired commits an overt act in pursuance of the conspiracy.[23]

▆ Jan argues that there was no evidence that she *agreed* to aid or abet James's drug operation. The State suggests that because there was a pot in the kitchen sink with unidentified white residue in or on it, "a rational trier of fact could reasonably conclude that she was well aware of the crack cocaine manufacturing activity being conducted inside the apartment and was a co-conspirator with her son in this enterprise." We disagree.

We agree that based on the evidence presented, a rational jury might suspect that Jan knew that James and/or Russell were "cooking" untested white residue in a pot found in the sink. But no rational jury, however, could have concluded *beyond a reasonable doubt* that Jan agreed to assist James's drug operation, because the State simply presented no evidence (circumstantial or direct) of an agreement between James and Jan. Moreover, the facts surrounding the extensive year long investigation of James suggest that no agreement existed. Jan was never present at any of the controlled purchases made from James. The search warrant only named Russell and James, and gave no indication that the police's year long investigation had raised any suspicion about Jan or even disclosed that she was temporarily staying at James's home. We therefore conclude that, based on the evidence the State presented, no rational jury could have found that Jan agreed to aid or abet James with his drug operation. Accordingly, Jan's conviction for Conspiracy Second Degree must be reversed.

those individuals approached the defendant and handed him money).

It is also worth noting that at least one other jurisdiction requires *"more evidence of knowledge and control to prove that a defendant constructively possessed contraband found in someone else's apartment, as opposed to his own residence."* United States v. Cruz, 285 F.3d 692, 697 (8th Cir.2002).

21. We also note that "a *prima facie* case of constructive possession may be established if there is evidence linking the accused to an ongoing criminal operation of which possession is a part." *Hoey*, 689 A.2d at 1181. Because we also find that no rational jury could link Jan to James's cocaine operation, we cannot accept any argument that Jan constructively possessed the cocaine in the walk-in closet through James. *See Infra* section II.2.

22. Indeed, the evidence might have satisfied the clear and convincing standard.

23. 11 *Del. C.* § 512.

### Conclusion

For the forgoing reasons, Jan's convictions for Trafficking in Cocaine Over 100 grams and Conspiracy Second Degree to Engage in Felony Criminal Conduct are VACATED. Her convictions for the remaining charges are AFFIRMED.

BERGER, Justice, dissenting:

The majority holds that there was insufficient evidence to support a guilty verdict on the charges of trafficking in cocaine and conspiracy. The majority purports to review the evidence in the light most favorable to the State, and says that a rational jury could not have concluded, beyond a reasonable doubt, that Jan exercised dominion and control over the powdered cocaine found in the walk-in closet. In summary, the majority finds that Jan was a user of pink crack cocaine who happened to be taking a "temporary rehabilitative sojourn" in her son's home when the police busted her son's drug operation.

The evidence certainly could lead a rational juror to conclude that Jan was, in effect, an innocent bystander who had no involvement in her son's business. But the evidence also could support the conclusion that Jan was a cocaine dealer, and that, while recuperating at her son's house, she was involved in his criminal enterprise. The police found evidence that someone had been cooking cocaine in the kitchen; they found Jan standing near the door of the closet where the powdered cocaine was stored; they found 8 bags of the finished product (pink crack cocaine), packaged for sale, in her sock; and she gave a false name when arrested. True, the police did not find food coloring, which drug dealers commonly add to cocaine, and which would help establish that the cocaine in Jan's sock was cooked at her son's house as part of their trafficking business. The majority says that, because the police did not find food coloring, a rational jury could not make the link between the powdered white cocaine in the closet and the cooked pink cocaine in Jan's sock. I disagree. It would have been a stronger case if the police found red food coloring, but that piece of evidence was not crucial. There was evidence that people were cooking powdered cocaine on the kitchen stove. When cooked, powdered cocaine turns into crack cocaine, which typically is sold in small quantities, packaged in plastic baggies. Eight such baggies were found in Jan's sock, and there was expert testimony that she was a dealer, not just a user. A reasonable jury could conclude from this evidence that Jan's pink crack cocaine was the end product of this ongoing criminal operation and, therefore, that she constructively possessed the powdered cocaine found in the closet.[24] Accordingly, I dissent.

---

**24.** *McNulty v. State*, 655 A.2d 1214, 1217 (Del.1995).