Adam LECATES, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 372, 2008.

Supreme Court of Delaware.

Submitted: April 22, 2009.
Decided: June 19, 2009.
Corrected: Oct. 15, 2009.*

---

* This opinion replaces and corrects the opinion published at 975 A.2d 799.

Bernard J. O'Donnell, Office of the Public Defender, Wilmington, DE, for appellant.

Danielle J. Brennan (argued) and Timothy J. Donovan, Jr., Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

STEELE, Chief Justice:

Adam Lecates, the defendant below, appeals from a Superior Court final judgment of conviction. After a bench trial, the trial judge found Lecates guilty of Possession of a Deadly Weapon by a Person Prohibited. On appeal, Lecates argues that the trial judge: (1) abused his discretion by failing to suppress a firearm found during an allegedly unreasonable search; and (2) legally erred by convicting him without sufficient evidence that he possessed that gun. We find no merit to Lecates' arguments and **AFFIRM**. Because we recognize certain inconsistencies amongst our precedents addressing gun possession, we also take this opportunity to explain definitively that we apply distinct possession standards when analyzing the sufficiency of the evidence supporting PDWDCF and PDWPP convictions.

### FACT AND PROCEDURAL BACKGROUND

On December 28, 2007, at around 12:30 a.m., New Castle County police received a report of gunshots in the Brookmont Farms area. Witnesses reported that a white Pontiac and a gold Chevrolet Lumina sped away from the scene of the shooting. Approximately eight minutes later, as NCCPD Officer Christopher Sarnecky neared Brookmont Farms, he passed a Wawa convenience store less than a mile from the reported gunfire's location. Sarnecky observed a white Pontiac and a gold Lumina parked at that Wawa's gas pumps. He also observed two other cars parked nearby with 10 to 12 people milling about the parking lot. Officer Sarnecky executed a U-turn and returned to the Wawa. The two other cars and most of the people had left by the time Sarnecky returned.

Sarnecky and another responding officer "boxed in" the Pontiac and Lumina with their patrol cars and detained three persons: Lecates, David Gaunt, and Michael Allen. When Sarnecky encountered the men, Lecates stood between the Pontiac and Lumina, while Gaunt and Allen sat in the Pontiac. No one occupied the Lumina. Sarnecky questioned Lecates about the Lumina for approximately 15 minutes, but Lecates claimed to know nothing about that car. Sarnecky searched DMV records and learned that the Lumina's title had recently been transferred but the new owner had not yet registered the vehicle.

After an additional 15 to 20 minutes passed with no one claiming the Lumina, Sarnecky deemed the car abandoned and arranged to have it towed. In accordance with NCCPD policy, he conducted an inventory search, and on the Lumina's front bench seat, under the armrest, he found a 9mm Ruger pistol. In the glove box, Sarnecky found the Lumina's title signed by Lecates. Sarnecky then arrested Lecates for possession of a deadly weapon by a person prohibited and for carrying a concealed deadly weapon.

Lecates waived his right to a jury trial in exchange for the State dropping the concealed weapon charge. Lecates did not contest that his prior conviction rendered him a "person prohibited" from possessing a deadly weapon. Before trial, Lecates moved to suppress the handgun, claiming that the police unlawfully searched the Lumina. At the suppression hearing, Lecates called Allen as a witness. Allen testified that he and the Pontiac's driver, Robert Barnett, arrived at the Wawa in that vehicle shortly before Sarnecky. They stopped for gas, and Allen used the restroom. When Allen returned, several peo-

ple stood in the parking lot. Knowing Gaunt and Lecates, Allen greeted them. Gaunt approached Allen from the Lumina's passenger's side and Lecates approached from the driver's side. Allen testified that Gaunt was "flashing" the Ruger and was "bragging about something." Although Allen testified that Gaunt was never in the Pontiac, Sarnecky testified that he personally removed Gaunt from that vehicle. After hearing testimony from Sarnecky and Allen and arguments from counsel, the trial judge orally denied Lecates' motion to suppress the gun.

Notwithstanding some confusion between the trial judge and counsel, the trial judge then proceeded with Lecates' bench trial.[1] Neither side presented any further testimony, and the only new evidence introduced by the State included Lecates' conviction record and firearms records showing Gaunt's step-father as the Ruger's registered owner. The trial judge convicted Lecates of PDWPP. This appeal followed.

### DISCUSSION

On appeal, Lecates advances two claims of error. First, he argues that the trial judge erred by denying his motion to suppress the firearm. Second, Lecates claims that the State presented insufficient evidence to establish that he possessed that firearm.

### I. The Trial Judge Did Not Abuse His Discretion By Denying Lecates' Motion to Suppress.

In denying Lecates' motion to suppress, the trial judge determined that Sarnecky reasonably considered the Lumina aban-

---

1. The attorneys appeared to be under the impression that they were arguing only the suppression issue on that day, but the trial judge believed they would immediately try the case if he decided that the police legally obtained the gun.

doned because Lecates denied owning that car and a significant period had passed without anyone asserting ownership. Lecates argues that the inventory search violated his Fourth Amendment rights because the police lacked reasonable and articulable suspicion that he had committed a crime, and therefore illegally detained and questioned him in the Wawa parking lot.

The State argues that the report of a Pontiac and a Lumina involved in a shooting nearby provided sufficient grounds for Sarnecky to temporarily detain Lecates for questioning. Given that basis for detaining Lecates, the State argues that the facts that Lecates denied owning the car and that no one else asserted an interest in the car, made it reasonable for Sarnecky to impound the vehicle and conduct an inventory search.

We review *de novo* the denial of a motion to suppress evidence based on an allegedly illegal stop and seizure.[2] We must decide whether the totality of the circumstances supports a reasonable and articulable suspicion for the detention.[3]

We define "reasonable suspicion" as "the officer's ability to 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.' "[4] Here, Sarnecky reasonably detained and questioned Lecates after receiving a report that a gold Lumina and a white Pontiac sped away from the Brookmont Farms area after the reported gunfire. Within minutes of receiving that report, Sarnecky saw a gold Lumina and a white Pontiac less than a mile away from the scene of the shooting. It was reasonable to infer from those facts that those cars at the Wawa were likely the same ones reportedly involved in the shooting. It was also reasonable to infer that Lecates, who was standing between the two cars, may have known something about the cars or the shooting. Therefore, Sarnecky reasonably detained and questioned Lecates, and the resulting seizure and inventory search of the Lumina did not violate the Fourth Amendment.[5]

## II. The State Presented Sufficient Evidence to Establish that Lecates Possessed the Gun.

The trial judge, acting as fact finder, determined that Lecates had: (1) knowledge of the gun's location; (2) an ability to put the gun under his control; and (3) intent to possess or otherwise control the pistol. Therefore, he concluded that Lecates constructively possessed the gun. Lecates claims that the State presented insufficient evidence to establish beyond a reasonable doubt that he constructively possessed the firearm. He asserts that the admitted evidence only shows that Gaunt possessed the gun and that, even if he (Lecates) was near the gun, he lacked the intent necessary for constructive possession. The State responds that accessibility rather than physical control is the touchstone of possession—*i.e.*, Lecates had access to the gun and therefore possessed the gun.

---

**2.** *Lopez–Vazquez v. State*, 956 A.2d 1280, 1285 (Del.2008).

**3.** *See generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**4.** *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868).

**5.** We find no merit to Lecates' contention that Sarnecky should have questioned all of the Wawa employees and customers about the Lumina. Given the nature of Wawa's business as a convenience store, Sarnecky reasonably believed that the Lumina's owner would have returned within the time he waited and detained the three men.

We review to determine whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of all the elements of the charged crime.[6]

Lecates and the State articulate different tests for constructive possession of a firearm. The State claims that the governing rule is that:

> The custodian of an automobile is presumed ... to have dominion and control of contraband found in the automobile; and ... if under the totality of the circumstances, such dominion and control may be found to be a conscious dominion and control, the evidence is sufficient to warrant the conclusion of "possession" as to the custodian.[7]

Lecates claims that the test for the constructive possession of drugs articulated in *White v. State* controls:

> [T]o establish constructive possession, the State must present evidence that the defendant: (1) knew the location of the drugs; (2) had the ability to exercise dominion and control over the drugs; and (3) intended to guide the destiny of the drugs....[8]

Recognizing that our pertinent case law is not entirely clear, we take this opportunity to restate the correct test for con-structive possession of a firearm.[9] Much of the confusion arises from our previous attempts to distinguish between the possession of stolen goods,[10] the possession of a deadly weapon by a person prohibited,[11] possession of a deadly weapon during the commission of a felony,[12] and the various drug possession crimes[13]. To help clarify existing inconsistencies, we discuss below several of our significant precedents from the last 40 years. These cases demonstrate that we analyze PDWPP possession differently than PDWDCF possession. Specifically, we apply a more limited definition of possession to PDWDCF than PDWPP because, unlike establishing PDWPP, establishing PDWDCF requires evidence of physical availability and accessibility.

### We Analyze PDWPP Under the Same Standard as Drug Possession

In *Mack v. State*, we sought to define possession as it relates to PDWDCF.[14] We determined that "the general 'dominion, control, and authority' definition of 'possession' used in drug cases" and "the general 'dominion, control, and authority' definition used in the presumption arising from 'possession' of recently stolen goods" are inapplicable to PDWDCF.[15] "Possession of the contraband, Per [sic] se, actual or constructive, is the crux of the matter in

---

6. *Winer v. State,* 950 A.2d 642, 646 (Del. 2008).

7. *Evans v. State,* 1992 WL 404282, at *2 (Del.).

8. 906 A.2d 82, 86 (Del.2006).

9. "[B]oth in common speech and in legal terminology, there is no word more ambiguous in its meaning than possession. It is interchangeably used to describe actual possession and constructive possession which often so shade into one another that it is difficult to say where one ends and the other begins." *National Safe Deposit Co. v. Stead,* 232 U.S. 58, 67, 34 S.Ct. 209, 58 L.Ed. 504 (1914).

10. *See generally Crawley v. State,* 235 A.2d 282 (Del.1967).

11. 11 *Del. C.* § 1448.

12. 11 *Del. C* § 1447.

13. *See, e.g.,* 16 *Del. C.* §§ 4751–54.

14. *See* 312 A.2d 319, 322 (Del.1973).

15. *Id.*

such cases. Proximity of the contraband, and immediate control thereof, is not an essential element of those definitions."[16]

■ To the contrary, PDWDCF requires more than merely possessing a gun.[17] As it relates to PDWDCF, we determined that:

[T]he word "possession" has a more limited meaning; that it requires the elements of availability and accessibility. We hold that a felon is in "possession" of a deadly weapon, within the meaning of [PDWDCF], only when it is physically available or accessible to him during the commission of the crime. General "dominion and control" of a weapon located elsewhere, and not reasonably accessible to the felon, obviously is not the test under [PDWDCF].[18]

We continue to agree with that test for PDWDCF possession.[19]

Our possession calculus became somewhat murkier following our holding in *Sexton v. State*.[20] In *Sexton*, we applied the *Mack* PDWDCF possession standard to a PDWPP charge.[21] Reviewing the sufficiency of the PDWPP evidence, we inaccurately stated that "[t]he jury need only have found the weapon physically available and accessible to the defendant and their verdict is amply supported by the record."[22] Physical availability and accessi-

bility of a weapon, *alone*, are not sufficient to establish PDWDCF. As we explained in *Mack*, possession as used in the PDWDCF statute "has a more limited meaning" than the general definition of possession.[23] We concluded that to establish possession the State must present evidence that the weapon was physically available and accessible *in addition to establishing general dominion and control*.[24]

It is also clear that we should not have applied the *Mack* PDWDCF possession standard to *Sexton*, a PDWPP case. We distinguished PDWPP from other possessory offenses because, in those cases and unlike establishing PDWDCF, it is the possession of the contraband, *per se*, that is prohibited.[25] Possession of a deadly weapon by a person prohibited *is a per se* violation of 11 *Del. C.* § 1448. The more limited PDWDCF possession definition (requiring physical availability and accessibility) does not apply to PDWPP.[26]

■ In *Pauls v. State*, we clarified our *Mack* PDWDCF possession standard,[27] and reaffirmed that "[a] person is in 'possession' of a deadly weapon only when it is physically available or accessible to him during the commission of the crime."[28] "The elements of availability and accessibility, however, do not require the weapon

16. *Id.*

17. *Id.*

18. *Id.*

19. See *Maddrey v. State*, 975 A.2d 772, 2009 WL 1654545 (Del.Supr. June 15, 2009).

20. See generally 397 A.2d 540 (Del.1979), rev'd on other grounds by *Hughes v. State*, 437 A.2d 559, 566 (Del.1981).

21. *Id.* at 547.

22. *Id.* (citing *Canty v. State*, 394 A.2d 215 (Del.1978); *Mack*, 312 A.2d 319).

23. *Mack*, 312 A.2d at 322.

24. *Id.*

25. *Id.*

26. See *Maddrey*, 975 A.2d 772, 2009 WL 1654545, at *5.

27. See generally 476 A.2d 157 (Del.1984); see also *Maddrey*, 975 A.2d 772, 2009 WL 1654545, at *3.

28. 476 A.2d at 160 (quoting *Mack*, 312 A.2d at 322).

to be in the offender's immediate physical possession or within easy reaching distance of the offender." [29] We determined that "[t]he purpose of the [PDWDCF] provision is to 'prevent a "non-violent" felony from becoming a violent one,' and the term 'during the commission of a felony' as used in 11 *Del. C.* § 1447 encompasses a somewhat extended time frame." [30]

In *Barnett v. State*, Barnett appealed both his PDWDCF and PDWPP convictions. [31] Although we did not fully explain that the State must still establish general possession, we correctly noted that in *Mack* the Court "construed the word 'possession' in [the PDWDCF statute] as encompassing the elements of availability and accessibility." [32] We reversed Barnett's PDWDCF conviction because "[t]he record evidence does not support a finding that the firearm inside of a locked box in a hallway linen closet was available and accessible to Barnett *during* the commission of any felonious drug activity." [33]

In addressing Barnett's PDWPP conviction, we again applied the *Mack* PDWDCF possession standard. [34] Specifically, we relied on *Sexton's* holding that to establish PDWPP "a jury must find that a weapon was 'physically available and accessible to the defendant.' " [35] Based on this misapplication of *Mack*, we reversed Barnett's PDWPP conviction. [36] We concluded that, under 11 *Del. C.* § 1448, Barnett did not

possess a firearm locked inside of a box in a hallway linen closet because it was not physically available and accessible to Barnett. [37] What we should have applied was the general constructive possession test, not *Mack's* "more limited" PDWDCF possession test. [38]

 In *Miller v. State*, this Court moved away from applying the *Mack* PDWDCF possession standard to PDWPP cases. [39] Although we did not explicitly address *Sexton* or our other precedents that equated PDWDCF possession and PDWPP possession, we did correctly distinguish between those two crimes, as follows:

> Unlike the statute defining the crime of PWDCF, Section 1448(a) contains no requirement of temporal possession. The PWDCF statute prohibits weapon possession *during* the felony. In contrast, Section 1448(a) makes it a crime for a prohibited person to possess a weapon or ammunition *at any time*. Therefore, under Section 1448(a), the State need only prove that a defendant possessed or controlled a weapon at some point, not necessarily at the time of his arrest. [40]

We correctly concluded that establishing PDWPP does not require presenting evidence that a deadly weapon was physically available and accessible at the specific time

---

**29.** *Pauls*, 476 A.2d at 160 (citations omitted).

**30.** *Id.* (quoting *Mack*, 312 A.2d at 322); *see also Maddrey*, 975 A.2d 772, 2009 WL 1654545, at *3.

**31.** *Barnett v. State*, 691 A.2d 614, 615 (Del. 1997).

**32.** *Id.* at 617.

**33.** *Id.* at 618.

**34.** *See id.* at 619.

**35.** *Id.* (citing *Sexton*, 397 A.2d at 547).

**36.** *Id.*

**37.** *Id.*

**38.** *See Mack*, 312 A.2d at 322.

**39.** *See generally* 2005 WL 1653713 (Del.).

**40.** *Id.* at *3 (emphasis in original); *see also Maddrey*, 975 A.2d 772, 2009 WL 1654545, at *5.

of arrest.[41]

In *Godwin v. State*, we returned to our holdings in *Sexton* and *Barnett*.[42] Notwithstanding *Miller* this Court again applied an incomplete version of the *Mack* PDWDCF possession standard to a PDWPP case. We stated: " 'Possession' of a weapon under 11 *Del. C.* § 1448 means that the weapon is 'physically available and accessible to the defendant.' "[43] Although we did not fully explain that the State must prove possession generally in addition to the weapon's physical availability and accessibility, we did note that possession may be actual or constructive,[44] and defined constructive possession as occurring "when a person 'has *both the power and the intention* at a given time to *exercise control* over a substance.' "[45]

■ From reviewing the past 40 years of possession precedents, we recognize the need to clarify several points. We originally recognized that PDWDCF's possessory element has a "more limited" meaning than other possessory crimes.[46] Unlike other possessory crimes (*e.g.*, drug possession) where "[p]ossession of the contraband, Per [sic] se, actual or constructive, is the crux of the matter[,]" establishing PDWDCF requires more.[47] The PDWDCF statute does not forbid possession *per se*; rather, "forbidden is its availability under certain circumstances[,]" and "the general 'dominion,

control, and authority' definitions of possession are too broad." [48] Therefore, we correctly concluded that "a felon is in 'possession' of a deadly weapon, within the meaning of [PDWDCF], only when it is physically available or accessible to him during the commission of the crime." [49] That is not to say, as *Sexton* suggests, that "[t]he jury need *only* have found the weapon physically available and accessible." [50] The State must establish physical availability and accessibility *in addition to* proving actual or constructive possession.

Contrary to *Sexton* and its progeny, we find no reason to apply the "more limited" *Mack* PDWDCF possession standard to PDWPP cases. As stated in *Miller*, it is a "crime for a prohibited person to possess a weapon or ammunition *at any time*." [51] PDWPP's possessory element is exactly like those in other possessory offenses from which we distinguished PDWDCF in *Mack*. Possession of a deadly weapon by a person prohibited, without more, is the crux of a PDWPP charge. Physical availability and accessibility are not essential to establishing PDWPP. Instead, PDWPP possession must be analyzed under the same standard as drug possession.

### The White v. State Constructive Possession Test Controls

■ The State asserts that Lecates, the Lumina's custodian, is presumed to have dominion and control over any con-

---

41. *Id.*; *see also Maddrey*, 975 A.2d 772, 2009 WL 1654545, at *5.

42. *See* 2006 WL 1805876, at *1 (Del.).

43. *Id.* (citing *Barnett*, 691 A.2d at 619 (quoting *Sexton*, 397 A.2d at 547)).

44. *Id.* at * 1.

45. *Id.* (quoting *Thomas v. State*, 2005 WL 3031636, at *2 (Del.)).

46. *Mack*, 312 A.2d at 322.

47. *Id.*

48. *Id.*

49. *Id.*

50. 397 A.2d at 547 (citing *Canty v. State*, 394 A.2d 215 (Del.1978); *Mack*, 312 A.2d 319) (emphasis added).

51. 2005 WL 1653713, at *3 (emphasis in original).

traband found within that vehicle. The State relies on *Holden v. State*, where we stated:

> The law places a heavier burden upon the custodian of the automobile than upon a mere passenger in this respect. This Court has held that the custodian of an automobile is presumed, by reason of his status as custodian, to have dominion and control of contraband found in the automobile; and that if, under the totality of the circumstances, such dominion and control may be found to be a conscious dominion and control, the evidence is sufficient to warrant the conclusion of "possession" as to the custodian.[52]

We conclude, however, that this supposed "presumption" does not accurately state the test for possession of items found within an automobile.

Apparently out of whole cloth, we first suggested in *Crawley v. State* that an automobile's custodian is presumed to have dominion and control over all contraband found within that automobile.[53] In *Crawley,* this Court primarily addressed an entirely different presumption—*i.e.,* "the rule that guilt of ... theft may be inferred from the unexplained possession of recently stolen goods." [54] We summarized the State's evidence as follows:

> On April 19, 1966, at about 8:00 A.M., a truck of a piano company was stolen from the street in front of its store in Wilmington. The truck contained two organs, furniture-moving pads, and organ instruction manuals. The driver-employee of the piano company had taken the truck home the night before, thus

loaded, and had returned to the store early in the morning to punch his time card. The truck was stolen during the few minutes he was in the store. At about 8:45 A.M., three [ . . . ] men in a U–Haul truck were observed at a merchandise mart several miles outside Wilmington; the men were not identified. The piano truck was found abandoned at the mart, shortly thereafter, with the two organs and some of the pads missing. At about 11:30 A.M., the police apprehended a U–Haul truck near Wilmington; it was being driven by Samuels, with Dorsey along side him, and Crawley sitting in the rear. A search of the truck, made upon consent requested of Samuels only, disclosed some furniture-moving pads, two organ instruction manuals, and one sheet of music. The U–Haul truck had been rented by Samuels early on the morning of the theft. The rental agent identified Samuels as the renter, but could not say whether any one else accompanied him, except that an unidentified [ . . . ] man drove Samuels to the rental agency.[55]

We reversed James Crawley and Robert Dorsey's larceny convictions on the basis that "the State failed to prove possession of the character required to warrant a presumption of guilt of the theft." [56]

To invoke the presumption that Crawley and Dorsey committed the theft, we determined that *"the possession to be proved must be actual,* and must be shown to include the elements of dominion, control, and authority over the stolen property." [57] We noted that "[n]either of the appellants was the owner, operator, or custodian of

---

**52.** 305 A.2d 320, 322 (Del.1973).

**53.** *See* 235 A.2d 282, 284 (Del.1967).

**54.** *Id.* at 283.

**55.** *Id.*

**56.** *Id.* at 284. Samuels did not appeal from his larceny conviction. *Id.* at 283.

**57.** *Id.*

the truck" and "[t]here was no evidence that either of the appellants had any dominion or control over the vehicle or the stolen goods found therein." [58]

After concluding that "the Trial Court erred in admitting in evidence against these appellants the articles found in the truck, and in charging the jury that the appellants were subject to the presumption of guilt here involved[,]" we distinguished *Flamer v. State*,[59] on the basis that: "That case is inapposite because the fact of possession was not in issue there; the defendant in that case was the driver and custodian of the automobile, by reason whereof he was deemed to have control and dominion over-and therefore possession of-the stolen goods found in the vehicle." [60] Without providing any citations or further explanation, we created *ex nihilo* a presumption that automobile custodians have *actual* possession of items found in their vehicles.[61]

We did not suggest this type of presumption in *Flamer*. Like Crawley, Flamer asserted that "the trial court erred in applying ... the rule that the unexplained possession of recently stolen property permits a presumption of guilt." [62] Flamer contended that "the presumption of guilt is impermissible unless the possession of recently stolen property is 'personal and exclusive,'" and that he was "not in exclusive possession of the stolen property because two other persons were with him in the automobile in and about which the articles were found." [63]

We rejected Flamer's argument and adopted a corollary to the general rule that possession must be exclusive: [64]

[T]he requirement that possession must be 'exclusive', in order to incriminate, does not mean that the possession must necessarily be separate from all others. An 'exclusive possession' may be the joint possession of two or more acting in concert. Where the only persons having control of, or access to, the stolen property are the defendant and his co-conspirators, joint possession of the stolen property may incriminate the defendant as well as his confederates. *Before the corollary is applicable, however, there must be substantial evidence of the defendant's complicity in the offense, apart from the possession itself; there must be substantial proof that the defendant acted in concert with others in joint possession before the presumption of guilt may arise from the joint possession.*[65]

In applying this corollary (and only in this context), we referred to Flamer's custody of the vehicle containing stolen goods,[66] as follows:

Applying the rule and its corollary in the case before us, it is clear from the above statement of the State's case that there was substantial evidence of Flamer's complicity in the burglaries. *That Flamer acted in concert with the others, and with a common purpose to commit the burglaries,* is evidenced by the facts that the automobile was in his custody

---

58. *Id.* at 284.

59. *Crawley*, 235 A.2d at 284 (citing 227 A.2d 123 (Del.1967)).

60. *Id.*

61. *Id.* As noted above, we held that presuming theft from possession requires proof of *actual* possession.

62. *Flamer*, 227 A.2d at 126.

63. *Id.* at 127.

64. *Id.*

65. *Id.* (emphasis added).

66. *Id.*

and control; that all three men were seen together shortly before the burglaries; that, shortly after the burglaries, Flamer was driving the automobile containing the stolen goods and the other offenders; that he attempted to escape the police; that, of the three, only Flamer had a cut which could be related to the blood on the door of the Dill house. *Such evidence of complicity* is adequate, in our opinion to warrant a charge on the presumption of guilt based upon joint possession.[67]

We never held that Flamer was presumed to have actual possession of the stolen goods merely because the automobile was in his "custody and control." To the contrary, we noted:

> In the instruction to the jury, the trial court charged that *if the jury found* that the specified property was stolen *and that this defendant soon thereafter was in possession of that property* ... then that possession is prima facie evidence of the commission of the larceny and of the burglary.[68]

Contrary to *Crawley*, whether Flamer possessed stolen property found in an automobile under his custody and control was a question for the jury.

In *Gibbs v. State*, we repeated the evidently baseless *Crawley* presumption.[69] We stated that "[w]e indicated in Crawley that the custodian of an automobile is deemed, by reason of his status, to have control and dominion of stolen goods found

therein."[70] We altered (and arguably eviscerated) that presumption, however, by adding: "We emphasize that such dominion and control must be conscious. The rule must not permit placing the driver of an automobile in jeopardy of the inference of guilt by reason of property brought by a passenger into his car, secretly and without his knowledge."[71] After reviewing the totality of the circumstances, we determined that Gibbs "had conscious dominion and control over the recently stolen tires found on the back seat of the car and in the trunk to which [he] had the key."[72]

We cited this altered presumption as the basis for the language in *Holden*, upon which the State now relies.[73] In somewhat inartful fashion, we described that purported presumption as follows:

> [T]he custodian of an automobile is presumed, by reason of his status as custodian, to have dominion and control of contraband found in the automobile; and that if, under the totality of the circumstances, such dominion and control may be found to be a conscious dominion and control, the evidence is sufficient to warrant the conclusion of "possession" as to the custodian.[74]

After Holden's conviction was affirmed, he petitioned the Delaware District Court for a writ of habeas corpus.[75] Holden argued that we evaluated the sufficiency of the evidence supporting his conviction in the light of a constitutionally impermissible presumption.[76] Despite finding our opin-

---

67. *Id.* (emphasis added).

68. *Id.*

69. *See* 300 A.2d 4, 5 (Del.1972).

70. *Id.*

71. *Id.*

72. *Id.*

73. *See* 305 A.2d at 322.

74. *Id.*

75. *See generally U.S. ex rel. Holden v. Anderson*, 373 F.Supp. 787 (D.Del.1974).

76. *Id.* Holden cited *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943) and *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). *Id.*

ion "somewhat unclear," then District Court Judge Latchum denied Holden's petition,[77] having concluded that "the Delaware Supreme Court did not apply an improper presumption in reviewing the sufficiency of the evidence. *Indeed, it applied no presumption.*" [78]

We agree with Judge Latchum's ultimate conclusion that it is meaningless to say that we *presume* dominion and control (*i.e.*, actual possession) but, at the same time, require the State to establish *conscious* or *knowing* dominion and control.[79] We do not, however, agree with his interpretation of 16 *Del. C.* § 4701. That section of the Uniform Controlled Substances Act defines possession as follows: " 'Possession,' in addition to its ordinary meaning, includes location in or about the defendant's person, premises, belongings, vehicle or otherwise within the defendant's reasonable control." [80] Judge Latchum concluded that, under the "express terms" of § 4701, a defendant *per se* possesses any drugs found in his premises, vehicles, *etc.*[81] ·

■ By *defining* possession as including "its ordinary meaning," the General Assembly demonstrates that the Judicial Branch is not alone in its occasional inartful descriptions. Nonetheless, we ex-

plained in *Thomas v. State*, that § 4701 merely *allows* for constructive possession in addition to actual possession (possession's "ordinary meaning" [82]) and does not create a *per se* rule of possession.[83] Rather, it remains within the jury's province to decide whether a defendant constructively possessed contraband.

In *Thomas*, we held that the trial judge correctly defined actual and constructive possession.[84] The trial judge instructed the jury that actual possession requires:

> A person who knowingly has direct physical control over a thing at a given time ... The *possession* of a drug by a passenger in an automobile is *more than* proximity to, or *awareness* of, the drug in the car. The State has the burden of proving a "possession" that amounts to a conscious dominion, control and authority over the drugs.[85]

The trial judge defined constructive possession as:

> In addition to actual possession, possession includes location in or about the defendant's person, premises, belongings or vehicle or otherwise within his reasonable control. In other words, a person who, although not in actual possession, has *both the power and the intention* at a given time *to exercise con-*

77. *Id.* at 790.

78. *Id.* (emphasis added).

79. *Id.* at 790–91.

80. 16 *Del. C.* § 4701.

81. *See U.S. ex rel. Holden,* 373 F.Supp. at 790–91. We reached a similar conclusion in *Marvel v. State. See* 290 A.2d 641, 644 (Del. 1972) ("The seized evidence was certainly located in the appellant's premises and this fact raised a rebuttable presumption that it was in his control and possession.").

82. "Actual possession is what most of us think of as possession—that is, having physical custody or control of an object." *United*

States v. Nenadich, 689 F.Supp. 285 (S.D.N.Y. 1988).

83. *See* 2005 WL 3031636, at *2 (Del.).

84. *Id.*

85. *Id.* (emphasis in original). Black's Law Dictionary 1183 (7th ed. 1999) defines actual possession as: Physical occupancy or control over property; *see also Robertson v. State,* 596 A.2d 1345, 1354 (Del.1991) ("A person who knowingly has direct physical control over a thing at a given time is regarded as being in actual possession of it.").

*trol* over a substance, either directly or through another person or persons is then in constructive possession of it. In order to prove constructive possession the State must show:

> One, defendant knew of the location of the drugs.
>
> Two, that the defendant had the ability to exercise dominion . . .
>
> And three, had the intention to guide their destiny.[86]

Because actual possession requires "direct physical control," it is nonsensical to "presume" (as we originally did in *Crawley*) that an automobile's custodian has actual possession over all contraband found *anywhere* in an automobile. For all of the above reasons, we conclude that *Holden's* "presumption" is both unfounded and unsound.

Instead, the appropriate question is whether Lecates constructively possessed the firearm.[87] Given our above analysis and conclusion that we review PDWPP possession under the same standard as drug possession, the three part constructive possession test most recently outlined in *White v. State*[88] controls our review.

■■■■ Therefore, to establish that Lecates constructively possessed the gun, the State needed to present sufficient evidence that Lecates: (1) knew the location of the gun; (2) had the ability to exercise dominion and control over the gun; and (3)

intended to guide the destiny of the gun.[89] Although "mere proximity to, or awareness of [contraband] is not sufficient to establish constructive possession,"[90] it is well established that circumstantial evidence may prove constructive possession.[91]

Lecates concedes that the State presented sufficient evidence for a rational jury to conclude that he knew the gun's location. He challenges, however, the sufficiency of the State's evidence concerning the two remaining constructive possession elements.

■■■■ We conclude that the State presented sufficient evidence to permit the trial judge to conclude, beyond a reasonable doubt, that Lecates constructively possessed the firearm. Viewing the evidence in the light most favorable to the State, the record reflects that: Lecates and Gaunt were likely involved in the reported shooting in the Brookmont Farms area; Lecates drove the duo in his Lumina to the Wawa; Gaunt brandished a gun in the parking lot sometime before the police arrived; Lecates repeatedly lied to the police about owning the Lumina; and the police found the gun under the Lumina's front seat armrest. Given these facts, we find that the State sufficiently demonstrated that Lecates knew the gun's location, had the ability to exercise dominion and control over that gun, and intended to guide the destiny of that gun.

---

86. *Thomas*, 2005 WL 3031636, at *2 (emphasis in original). Black's Law Dictionary 1183 (7th ed. 1999) defines constructive possession as: Control or dominion over a property without actual possession or custody of it.

87. At trial, the State asserted that it "relie[d] in this case, on the classic definition of constructive possession."

88. 906 A.2d 82.

89. *See id.* at 86.

90. *White*, 906 A.2d at 86 (citing *Holden*, 305 A.2d 320).

91. *White*, 906 A.2d at 86 (citing *Hoey v. State*, 689 A.2d 1177, 1181 (Del.1997)). Although the State is usually able to present direct evidence of proximity and awareness, all the elements of constructive possession may be established by circumstantial evidence. *See Skinner v. State*, 575 A.2d 1108, 1121 (Del. 1990).

*CONCLUSION*

For the foregoing reasons, the judgment of the Superior Court is affirmed.